Good morning, Council. Good morning, Your Honor. If it pleases the Court, my name is William Sintolo, C-I-N-T-O-L-O, and I appear on behalf of Mr. Gaw. This case involves a license procedure that existed in the Massachusetts Registry of Motor Vehicles that was commonly referred to as a merger process. A merger process had not existed or had existed in previous times and was changed at or about this time. With regard to the charges in this particular case, Mr. Gaw was charged in a number of mail fraud counts and a Hobbs Act violation. Immediately before trial began, the government acknowledged that Mr. Gaw's participation in either 10 or 11 of the mail fraud counts was not really involving mail. Well, they dismissed the charges. And they dismissed the charges. Okay. So we have one charge basically involving a mail fraud and one charge involving a Hobbs Act violation. In this particular case, the government contends that Mr. Gaw received a bribe, a kickback, for his participation. Mr. Gaw was an inspector. What he did basically was he inspected to determine whether or not the bays at which the license would be operated was 10 feet by 30 feet. He had no other task. He had no other function at the Massachusetts Registry. At that particular time, he did this on a number of occasions, and the government has acknowledged that on each and every time he performed this task, he did it correctly and properly, even with regard to the one incident that he's involved with involving a Joseph Yusef. The government contends that what happened is the defendants, the co-defendants, a Mr. Rad and a Mr. LaFrance, were engaged in what they called sham merger transactions. Now with regard to the sham merger transactions, the basis for that was, could have been, the 10 or 11 other cases that were dismissed. With regard to the one count they went to trial on, there is nothing in that particular incident that follows the same paradigm as the sham transactions. The difficulty with the proof in this case was that there actually existed at that time a legitimate process to merge two businesses in order to move a license. There was a distinction between the facts alleged against Mr. Goff and what would be considered by Mr. Devaney, who was the head of that program, what he would consider to be a proper merger. The difficulty was nowhere does the proper merger procedure exist. Meaning there's no writing, there's no... Just to understand your argument, if we thought that the record supported the conclusion that your client knew that this particular merger was a sham. Correct. There's no basis for reversing the conviction on your theory? I believe there is, yes. What would be assumed then that we thought the record supports the conclusion that your client knew this particular merger was a sham. What would be the basis for reversing the conviction? That the funds that received were not a bribe or a kickback. Why would that matter with respect to the aiding and abetting theory? Because it would still require some knowledge. When you say if you determined that this was a... He knew that this particular one was fraud. In order for him to know that this particular transaction was a fraud, he would have to know that the application filed or that the merger documents filed. I understand that. I'm just asking, do you have a theory on which you could win, in which the record supports the conclusion that he knew this particular thing was a sham? If he knew. Yes, we'll assume he knew. Okay. If we assume... And then what is your argument? If you assume that he knew that it was a sham, yes. Because even if he understood that it wasn't, if I can just, before I say that, in order for it to be a sham, there has to be a process. In order for him to know about it, he has to know what the process is. We're talking about a forgery, but there's nothing in the record that indicates he knows there's a forgery. But what you are arguing to us, I think, is that because there was nothing written down anywhere, that whatever happened here could not have been a crime because you couldn't do anything. No, I'm not saying that. Well, that's what you seem to be saying. What I'm saying is that there was a policy. And the claim is that what made this different than the policy that was explained by Mr. Devaney, which we would consider the legitimate policy, the distinction between those was whether or not the seller, the emerging individual, whether or not he was going to retain an interest in the business. But the interest, the nature of the interest that he has to maintain is never described. Meaning, does he have to, is he required to have an active participation? Is he required to have a financial investment in the business? Is he required to do anything else other than act as an officer of the corporation? We are not talking about individuals. We're talking about merging corporations. So if one merges a corporation and one of the parties takes no active role, it doesn't mean that he hasn't involved in the merger. The best situation, I think, and to answer your question, is to compare the conversations that are put out in the appendix and the addendum in this particular case with regard to one individual, and that's an individual by the name of Roger. Roger's last name is not known. He was acting as a C.I. In the Roger conversation, when Mr. Rad explains the process to Roger, he explains about we're buying it, all you have to do is this, and then six months later you can take the individual from whom the license came, you can take him out of the corporation. Less than a month later, the government sends Roger in to talk to Mr. Gar, and he's wired. And he talks to Mr. Gar. That was a conversation that the government did not introduce into evidence, but instead the defendant introduced that into evidence. When Mr. Gar explains the procedure to Roger, he explains almost exactly the procedure that Mr. Devaney said is the way it should transpire. And he warns Roger two times during the course of that conversation, and Roger then asks the question, what I really want to know is, is this legal? And he says, yes, as long as they can transfer the license to you. And I think that sets his mindset. He expresses the procedure that should be followed. When he continues on that, the government contends that what he did is showing how he was complicit in this, that later on when there is a question, he says, we need sellers. Rad says to Gar, we need sellers. And Gar repeats basically what was said to Roger. And he says, yeah, we have to sort of buy those licenses. The contention is that they are buying these licenses and they are merging them. But the licenses were not for sale. Gar knew that, that licenses couldn't be sold. That licenses, there was a cap of 1,650 licenses in Massachusetts. Correct. There was a waiting list. The only people who seemed to get licenses were people who worked with France, Gar, and Rad. That's not so. That's not so. If you read the testimony of Mr. Devaney, at the same time there were other transfers being done. Seal, as it was used in the trial, was simply a word. As you can see, if you use the word, what they are always talking about is a merger. They were talking about machines. In fact, nobody is selling the machines. The machine is useless. As Mr. Gar said to Roger, you can't just buy the machine. You have to buy the license. You have to have the license. They were using buy as another way of saying merger. Nobody ever talked that it was really buying the business. They were buying the market. So your argument is that on this record, this was a legitimate merger? No. I'm saying on this record. We have to assume it was a legitimate merger? No. I'm sorry. Well, that's what I'm trying to focus on. Whether your argument is that on this record we have to assume it was a legitimate merger, or whether your argument is simply even if it was not a legitimate merger, God didn't know that. That's correct. The second one. The second one is not mine. Okay. And back to my question then. Assume we thought the record shows that circumstantially, just as La France knew it was not a legitimate merger, God also knew it was not a legitimate merger. Is there any way for you to win? If you assume that, no. Okay. But I think that's an incorrect assumption. And the reason I say that is I argued in the briefs, I argued what in essence is a Cartesian circle. I argued that in order for one to assume or infer that Mr. Gore knew that the process was not legitimate, you would have to accept as your premise that he knew the process was not legitimate. The question, there is no direct evidence, none whatsoever. It's all either consciousness of guilt, and it's that one statement, what have you got for me? Well, the question, what have you got for me, means that I don't know if I've got anything coming yet. Okay. What do you have for me? One would assume that if he was part of it. If somebody, the normal reaction to what do you have for me is that you expect something. Correct. And why do you expect something? Why would somebody be giving you something for which there is no reason to give you anything if it's a legitimate deal? The same reason that Mr. Rad says he gave it to him as a fine discreet. We attempted to introduce into evidence. Why isn't that a jury question? No, I think it's a legal question because in this particular case, we tried to introduce into evidence 268A of the Massachusetts general laws. In that particular case, one, it's almost like a moonlighting situation. What have you got for me? It has to be, you have to understand that whatever he's given you is in response to an official act. In this particular case, even the indictment doesn't allege that what he's getting is in response to an official act. In paragraph 11H of the indictment. For the aiding and abetting theory, it doesn't have to be, does it? It still has to have the knowledge. Yeah. But then it says why isn't it a jury question whether that statement shows a jury could rationally find we think he was in on it. Because in order to be in on it, it would have to be a bribe. Somebody would have to have accepted a bribe to make it, from Mr. Gar's point of view, to make it illegal. No, he could be aiding and abetting them without being bribed. He could be aiding and abetting them by doing the inspection of a sham process, knowing that's what he's doing. Right? Knowing that, doing it knowing that it's a sham, I would contend not, obviously. Okay. What's that theory? That theory is, again, it's still based upon what the understanding has to be. And I understand Your Honor saying, oh, it's clear to us that it was a sham process because the document was forged. Okay. There's nothing before that. Remember, when they take the 11 out, there's nothing there about any of the other transactions. There's no indication that any of those other transactions were improper. Okay. The government can say they were. They can allege they were. But there was not one single word of testimony with regard to any of those other transactions. So we have a one circumstance, a one transaction situation, in which all Mr. Gar does is indicate to Mr. Red who might be interested in merging a license. And he conducts this measurement process. That's all he does in this. There's no transcripts indicating that he was ever told there was a forgery. There's no transcript, no testimony that he even knew where the license was coming from. The individual's name from whom it came was never mentioned, was never talked about. There is nothing. It's simply an after-the-fact attempt to approve by consciousness of guilt and statements, post-statements, that he understood that it was a sham. But all of those statements, what have you got for me, could be a fine dispute. It's moonlighting, but it's not in this particular situation. It's not a crime. It's not a crime that's charged in this case. That's what the government says he did. In Paragraph 11, they say he accepted a kickback as a fine dispute, not as a bribe, not as that which he was going to do. Well, if you go back to that, what have you got for me, there's a further question. We can make a lot of money if we have the buyer. We don't want the buyer. We want the sellers. That's where we can make $5,000 apiece. You know what I mean? Yeah. Now, that indicates a little bit more than you just alluded to. Well, unfortunately, it doesn't conclude there. That statement doesn't conclude there because what the transcript continues to say, yes, we can buy more licenses. And what it shows, in my opinion, okay, as I would look at it, is that Rad is lying to him. You don't lie to somebody you're in bed with. You don't lie to somebody you're a conspirator with. He says $5,000. Rad is making much more than that. Thank you, counsel. Thank you. Good morning. Good morning. Evan Rose on behalf of the government and with me at council table is Ted Merritt from the U.S. Attorney's Office. May it please the Court, David Gau's mail fraud and Hobbs Act convictions were supported by sufficient evidence. The alternative theories of guilt for each offense provide several alternatives by which Mr. Gau's conviction can be affirmed, and it's our position that each theory is sufficient. However, in our view, the most straightforward path by which this Court can affirm Mr. Gau's conviction is the honest services fraud theory on the mail fraud count and the undercolor official right theory on the Hobbs Act count. The only issue in dispute under these theories is whether the payments Mr. Gau received in connection with the scheme were made in exchange for official acts. If the Court concludes that the evidence was sufficient to allow the jury to reasonably conclude that Gau had agreed to accept these payments in exchange for official acts, or if Mr. Gau was involved in LaFrance receiving payments in exchange for official acts, then I would submit the Court need to go no further and it should affirm Gau's conviction. Counsel, we have a very interesting amicus brief that's been filed with us, but I'm not certain the question is actually in front of us. It's an issue about jury instructions. I take it that was not raised in the trial court? No objection on that basis was raised in the trial court? That's correct, Judge Lynch. Mr. Gau did not raise this below. He's not raised it here. He's not sought to adopt the amicus argument, and in our view, there's no reason for the Court to address it. Okay. I'd point out that Mr. Gau doesn't challenge, doesn't raise any challenge to the evidence that he was aware of LaFrance receiving payments for official acts. His only argument is that he himself did not raise payments or receive payments in exchange for official acts, but we believe there was ample evidence that the payments Gau accepted from Mr. Abarat and Mr. Youssef were made in exchange for official acts. Well, what do you say to their argument that he didn't do anything, really, other than measure the space and say the space was okay and that his job was to measure the space? What do you say to that argument, that he didn't do anything else? Your Honor, I would point to five different pieces of evidence that I think are among the strongest that show that Mr. Gau received, the payments that he received were in exchange for official acts. First and foremost, Abarat describes Gau's role in the scheme to Roger, the government's cooperating informant, and he says, Gau's in my pocket. We'll pay Gau, he'll do whatever we want, Gau will expedite his role in the transaction. I think that alone, the fact that Gau is prepared to do whatever Abarat wants in exchange for money, shows that he would use his official role to further the scheme. Second, Gau referred Youssef to Abarat, and he did it, as Youssef testified, during an official visit to the station that Youssef worked at before he opened his own station. So I think the jury could infer from that that the only reason that Gau was able to make that referral was through his official role and his credibility as the senior field inspector for the RMV. Third, Gau accessed RMV files to determine potential targets of the scheme, stations where he could obtain, where they might be able to obtain licenses. And would there have been any reason in his job for him to do that? I don't believe there would be any reason for him to be looking for potential targets for the scheme. I believe that there's reference in the record to a report that Gau would receive about the stations and stations opening and closing, but I don't believe there would be any reason for him to be accessing the information. To see who was not doing very much business. Exactly. And in contrast, Mr. Gau cites this court's case, Subinski. I'm not sure if I'm pronouncing that right. And he points to that as a case in which this court says just accessing files is not enough. But in that case, the defendant was an IRS employee who was accessing IRS data, taxpayer data, and what this court focused on was the fact that the defendant wasn't using that data for any sort of personal purpose. He wasn't passing it on to anyone. He was just accessing the data to satisfy his curiosity. And the court said in that circumstance, that would be an official act such that the defendant had committed on a services fraud. But in contrast to the – If he had sold that information, that would have been a different – That's exactly what the court implied in Subinski. And here, on page 115 of our appendix, Gau is passing that information on to Abarad. He tells Abarad, you know, I'm looking at this and trying to locate potential sellers. You know, I know that it's important to find these people and we can make a lot of money doing so. And, you know, he says, I've got to keep on and off it, make sure nobody knows what I'm doing. So it's – sorry. Go ahead, Your Honor. But there's no evidence here that Gau, as far as his official job was, that he did anything incorrect. He just went and measured it. So your argument would be it's all these other issues that he did, helping to find the people, facilitating that. That's the honest services fraud. Your Honor, there's no evidence that he performed any inspection incorrectly, that he approved any service station for license that didn't have the proper measurements or didn't have the proper equipment. That's correct. But, you know, that's – Excuse me, Your Honor. It is not really at issue whether he performed the requirements of the job. It really had to do with his motivation for doing so at a time when the registry was simply not giving these licenses to anyone. I would agree, Your Honor. I think he – excuse me. Go ahead. Finish the answer. I agree that he – his performance of the inspections in accordance with the R&B policy is not disturbing here. He was expediting the inspections, so I think that alone, sort of performing them faster than they ordinarily would have been performed, is an official act that he was being paid to undertake. The registry has set up this situation for corruption to happen. I mean, it's rather appalling that the only way you can get a license is through a bribery scheme. I'm concerned about the overall effect of this. If there was a bribery scheme, it's good you're prosecuting it. But why did matters get to this point? Your Honor, I think if the scheme had been in place, the licenses that were being diverted into the scheme would have gone to the waiting list. People would have legitimately been able to – And waited for two or three years. How many licenses were actually issued legitimately? I believe the cap was 1,600 or 1,400 licenses, Your Honor. And there was a provision by which station owners could, if they were in an area that didn't have an existing station that performed inspections, that they could apply without – Other than that, when they want to sell and a new owner comes in, that makes sense. But all of this sort of creates a climate in which it's easy for corruption to happen. Do you agree? Your Honor, I believe that – I mean, I certainly believe that the RMV, that LaFrance and Stegall were taking advantage of a situation where there was high demand created by the cap. I don't – we don't take a position on whether the RMV's policy, putting a cap in place, was a correct one. Can I go back to the aiding and abetting theory? Yes, of course. So if all he did was perform his job, let's just posit that GAW, in measuring the bay, but he's measuring a bay of a sham merger to facilitate the sham merger. Is that enough for aiding and abetting? I'm sorry, for aiding and abetting on a services fraud? LaFrance. LaFrance is on a services fraud. Your Honor, he would have to take any action in furtherance of the scheme with full knowledge, with advanced knowledge under the Supreme Court's decision in Rosemont that LaFrance was receiving payments in exchange for the sham. And if the thing he does is just measure the bay, that would be enough if he did it with full knowledge of the bribery scheme that LaFrance was involved in. In Rosemont, the Court says any act, whether it's encouragement, words, deeds, any act. I'm asking you, though, whether measuring the bay in this circumstance would be enough to count as the act that makes him liable for aiding and abetting. Your Honor, I think measuring the bay, if he knew that this was part of a sham merger and he knew that LaFrance was receiving money as part of the scheme and that he measured the bay and approved the bay with knowledge that the station owner was not entitled to a license because he had received a license through a sham merger, then yes, I believe that would be sufficient. Although he performed his duty just as he should have, it's our position that him not reporting what he knew to his direct supervisor debating in the RMV, for example, would be inaction. And your position is that the record supports that theory of the case? That's correct, Your Honor. Okay. Then does the finder's fee play a material role? Would it matter if he hadn't been paid? Your Honor, under the honest services, it wouldn't matter if he ultimately received payment, Your Honor. Under the honest services theory, the offense is completed when he agrees to undertake official acts in exchange for payment. So whether the payment's ultimately received. No, no, no, on the aiding and abetting theory. On the aiding and abetting theory? On the aiding and abetting theory, it wouldn't matter if he was even told he was going to be paid at all. No, absolutely, Your Honor. They're two separate theories. They're independent, and either one we believe fully supports Gau's guilt. The knowledge of the sham mergers is not required for the aiding and abetting money or property fraud. The knowledge of the sham mergers is not required for the honest services fraud. The receipt of payment is not an essential feature of the money or property fraud. Your Honor, I'd also like to point out that there's a separate independent theory that supports the, even if you were inclined to find that Mr. Gau did not receive official payments or did not conspire with LaFrance for LaFrance to receive payments in exchange for official acts, there's also the theory of extortion through fear of economic loss, which Mr. Gau has not raised in his brief, and I submit that that's a completely independent ground on which the court could form the Hobbs Act conviction. And if there's nothing further, Your Honor, I'll rest on my brief. Thank you. Thank you.